## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMES L. MAUGHAN,** | |
| *Plaintiff,* | |
| **v.** | **Case No. 1:20-cv-3199-RCL** |
| **U.S. DEPARTMENT OF JUSTICE and MERRICK GARLAND, U.S. Attorney General,** | |
| *Defendants.* | |

## <u>MEMORANDUM OPINION</u>

In this employment discrimination case, plaintiff James L. Maughan, an attorney proceeding *pro se*, alleges that defendants, the U.S. Department of Justice and Attorney General Merrick Garland (collectively "the Department"), violated the Rehabilitation Act of 1973 ("the Rehabilitation Act" or "the Act"), Pub. L. No. 93-112, 87 Stat. 355 (codified as amended at 29 U.S.C. § 791 *et seq.*), and its attendant regulations by failing to interview or hire him as a Trial Attorney in its Criminal Division's Appalachian Regional Prescription Opioid Strike Force. More broadly, Maughan, who is disabled, alleges that the Department's failure to interview him for the position is part of a broader unlawful failure by the Department to implement successfully its own affirmative-action plan for hiring persons with targeted disabilities ("PWTD") pursuant to the Rehabilitation Act's attendant regulations.

Before the Court is the Department's Motion for Summary Judgment, ECF No. 20. For the reasons that follow, the Court will **GRANT** that motion and **ENTER JUDGMENT** for defendants.

1

## I.   BACKGROUND

### A.  Factual Background

The following factual background is drawn from the summary judgment record and the Department's Statement of Undisputed Material Facts ("DSUMF"), ECF No. 20-2. Under Local Civil Rule 7(h)(1), "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." In this case, Maughan did not file a response to the Department's statement of facts. Accordingly, the Court deems every fact identified in that statement admitted.[1]

Maughan is an attorney residing in Louisiana. DSUMF ¶ 1. He has had both of his legs amputated and, as a result of neurological injuries, has limited use of and dexterity with both hands. *Id.* ¶ 2. The Department does not dispute that Maughan is disabled within the meaning of the Rehabilitation Act. *Id.*

In October 2018, Maughan applied for a Trial Attorney position in the Department's Criminal Division, Fraud Section, Appalachian Regional Prescription Opioid Strike Force. *Id.* ¶¶ 3, 5. The job description accompanying the public job posting indicates that "[t]his position is assigned in a front-line litigating unit that acts as a rapid response team, investigating and prosecuting health care fraud cases throughout the country," and, as such, "[e]ach case requires knowledge of the federal rules of criminal procedure, the federal uses of evidence, and federal criminal statutes relevant to health care fraud prosecutions." Trial Attorney Position Description at 4, Ex. 4 to Defs.' Mot. for S.J., ECF No. 20-7. The job posting itself states under the heading "Required Qualifications" that "[i]nterested applicants must possess a J.D. degree, be duly licensed

---

[1] "Although [Maughan] is proceeding in this action *pro se*, he is an attorney, . . . and is therefore presumed to have knowledge of the legal system. . . . As a result, he is not entitled to the same level of solicitude often afforded non-attorney litigants proceeding without legal representation." *Lempert v. Power*, 45 F. Supp. 3d 79, 81 n.2 (D.D.C. 2014) (citations omitted).

and authorized to practice as an attorney under the laws of any State, territory of the United States, or the District of Columbia, and be an active member of the bar in good standing." Trial Attorney Vacancy Announcement at 3, Ex. 2 to Defs.' Mot. for S.J., ECF No 20-6. Under the heading "Grade Specific Qualifications," the posting indicates that applicants must have at least two and a half years of post-J.D. legal experience to qualify at the GS-14 pay grade level or four years to qualify at the GS-15 level. *Id.* In addition, the posting lists the following under the heading "Preferred Qualifications":

- Experience as a criminal prosecutor.
- Knowledge of white collar criminal litigation.
- Experience in supporting, litigating, and supervising federal or state criminal cases.
- Experience in U.S. District Court or state court.
- Experience with the federal judiciary.
- Experience with healthcare fraud, either civil or criminal.
- Experience with narcotics prosecutions.

*Id.*

The Criminal Division's Human Resources Department ("HR Department") performed an initial screening of applicants to determine who among them possessed the required qualifications for the position. *Id.* ¶ 6. From that screening, the HR Department determined that 91 applicants possessed the minimum qualifications for the position only at the GS-14 level and 115 applicants—with Maughan among them—possessed the minimum qualifications at the GS-15 level. *Id.* ¶ 9. The HR Department referred the application materials of all candidates who passed the initial screening to Joe Beemsterboer, who at the time was the Chief of the Health Care Fraud Unit. *Id.* ¶¶ 10–11. Among the applications that Beemsterboer reviewed was Maughan's. *Id.* ¶¶ 12–13.

Maughan identified himself in his application as a "Schedule A candidate," or a candidate with a disability. *Id.* ¶ 13. According to the Department's official affirmative-action plan required

by the Rehabilitation Act, the Department regularly reaches out, with the help of recruiting consultants, to potential Schedule A applicants, and, upon request, allows them to apply for positions through a non-competitive process before vacancies are publicly posted, though the plan does not specify whether that process is always available. *See* Affirmative Action Plan for FY 2018 at 3–4, Ex. 4 to Pl.'s Opp'n, ECF No. 21-4. According to the Criminal Division's Director of Human Resource Operations, Megan Keate, the Department treats Schedule A applicants the same as other applicants where, as in the case of the vacancy for which Maughan applied, hiring is conducted through a competitive process. First Supp. Aff. of Megan Keate ¶ 1–2, Ex. 11 to Defs.' Mot. for S.J., ECF No. 20-15. Keate further states that the Department has a policy of interviewing at least one Schedule A candidate for any given vacancy if the hiring authority can identify a well-qualified Schedule A applicant. *Id.*

Beemsterboer narrowed the pool of applicants who met the minimum qualifications for the Trial Attorney position to 23 candidates for an initial round of interviews. DSUMF ¶ 17. Maughan was not among them. *Id.* ¶ 18. Beemsterboer did not select Maughan for an interview because Maughan's resume only indicated experience with civil litigation. *Id.* ¶ 19. According to Beemsterboer's review, "there was no indication of any criminal experience, no experience[] in federal or state criminal law, no experience in white collar prosecutions, no experience in health care fraud prosecutions, no experience at a state and federal level with drug investigations or prosecutions, and no experience working with any law enforcement agency partners," and accordingly, Beemsterboer "did not believe [Maughan would] be qualified for the job of this particular vacancy announcement." Examination of Joe Beemsterboer at 10:19–11:1, 11:13–14, Ex. 5 to Defs.' Mot. for S.J., ECF No. 20-8. Beemsterboer did not consider Maughan's disability as a factor in deciding to deny him an interview. DSUMF ¶ 27.

Beemsterboer did select one Schedule A disabled applicant—identified in the record as "Applicant No. 12"—for an initial interview, because that applicant had prior prosecutorial experience. *Id.* ¶ 20. However, Applicant No. 12 was not among the four candidates eventually selected for the Trial Attorney position. *Id.* ¶ 21. All four of the successful applicants had prior criminal litigation experience and specific drug- or healthcare-related experience. *Id.* ¶¶ 22–25.

The Department notified Maughan on September 26, 2019 that he was not selected for the Trial Attorney position. *Id.* ¶ 28.

### B. Procedural History

On December 3, 2019, Maughan filed a complaint with the Department's Equal Employment Opportunity ("EEO") Staff. In that complaint, he alleged that the Department had discriminated against him on the basis of his disability and age by failing to interview or hire him for several different positions, including the Trial Attorney position. EEO Complaint at 1, Ex. 18 to Defs.' Mot. for S.J., ECF No. 20-22. The complaint specifically alleged that the Department failed to interview him because its "Affirmative Action Plan ... was written for [Equal Employment Opportunity Commission] approval and without any intent to increase employment opportunities for [PWTD]." *Id.*

The Department investigated Maughan's complaint and issued a Final Agency Decision ("FAD") on July 28, 2020. *See* FAD, Ex. 21 to Defs.' Mot. for S.J., ECF No. 20-25. The FAD concluded that "[t]he record failed to show that [Criminal Division] managers subjected [Maughan] to prohibited discrimination based on age or disability," and accordingly denied Maughan's claims. *Id.* at 10.

Maughan filed the present action in this Court on November 3, 2020, alleging employment discrimination in violation of the Rehabilitation Act and its attendant regulations, but not age

discrimination. *See* Compl., ECF No. 1. The Department filed a Motion for Partial Dismissal, ECF No. 9, on January 25, 2021, arguing that the Complaint as originally filed asserted claims based on other failure-to-hire incidents for which Maughan had not exhausted his administrative remedies. However, in his opposition, ECF No. 10, Maughan clarified that he was only bringing claims related to the failure to hire him for the Trial Attorney position discussed above, and in response, the Department withdrew its Partial Motion to Dismiss, *see* ECF No. 11.

The Department filed the present Motion for Summary Judgment, ECF No. 20, on March 18, 2022. With the briefing complete, that motion is now ripe for review.

## II.   LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court evaluating a summary judgment motion must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Arthridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010).

### B. The Rehabilitation Act and its Attendant Regulations

"The Rehabilitation Act of 1973 governs employee claims of [disability] discrimination against the Federal Government. Its basic tenet is that the Government must take reasonable affirmative steps to accommodate [disabled individuals], except where undue hardship would result." *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993). As originally enacted, the Act "simply

spurred governmental efforts to employ [disabled individuals] through such measures as affirmative action plans and review committees." *Id.* (citing 29 U.S.C. § 791). However, in 1978, Congress amended the Act to clarify that it included a private right of action against federal agencies. Those amendments provide in relevant part that "[t]he remedies, procedures, and rights set forth in" the federal-employment provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, "shall be available, with respect to any complaint under [the Act], to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by failure to take final action on such complaint," 29 U.S.C. § 794a(a)(1). Congress amended the statute again in 1992 to clarify the substantive scope of that cause of action:

> The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment.

29 U.S.C. § 791(f).

"[T]he *McDonnell Douglass* burden shifting framework applies to discrimination claims under the Rehabilitation Act." *Webster v. U.S. Dep't of Energy*, 443 F. Supp. 3d 67, 80 (D.D.C. 2020) (citing *Kersey v. Wash. Metro. Area Transit Auth.*, 533 F. Supp. 2d 181, 189–90 (D.D.C. 2008), *aff'd*, 586 F.3d 13 (D.C. Cir. 2009)); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under that framework, "[f]irst, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981), which, in the disability-discrimination context, requires the plaintiff to show "1) that he had a disability within the meaning of [the applicable statute], 2) that he was qualified for the position, without an accommodation, and 3) that he suffered an adverse action because of his disability," *Dougherty v. Cable News Network*, 396 F.

7

Supp. 3d 84, 101 (D.D.C. 2019). Second, if the plaintiff succeeds in making out the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). "Once the employer has met this burden of production, the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer intentional discrimination or retaliation from all the evidence, including '(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'" *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 992–93 (D.C. Cir. 2002)).

Also at issue in this case is one of the Rehabilitation Act's original affirmative action provisions, which provides as follows:

> Each department, agency, and instrumentality (including the United States Postal Service and the Postal Regulatory Commission) in the executive branch and the Smithsonian Institution shall, within one hundred and eighty days after September 26, 1973, submit to the Commission and to the Committee an affirmative action program plan for the hiring, placement, and advancement of individuals with disabilities in such department, agency, instrumentality, or Institution. Such plan shall include a description of the extent to which and methods whereby the special needs of employees who are individuals with disabilities are being met. Such plan shall be updated annually, and shall be reviewed annually and approved by the Commission, if the Commission determines, after consultation with the Committee, that such plan provides sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for individuals with disabilities.

29 U.S.C. § 791(b).

Specific criteria that every agency's affirmative-action plan must satisfy are set out by regulation at 29 C.F.R. § 1614.203(d). That regulation provides, among other things, that every

plan must set a goal of ensuring that at least twelve percent of employees paid at the GS-11 level and above are individuals with disabilities and at least two percent are individuals with targeted disabilities. *Id.* § 1614.203(d)(7)(i). And as relevant in this case, another of the Act's attendant regulations provides that "[a]n agency may appoint . . . a person with an intellectual disability, a severe physical disability, or a psychiatric disability" through a non-competitive process. 5 C.F.R. § 213.3102(u)(1).

## III.   DISCUSSION

The Court will grant summary judgment to the Department for three reasons. First, Maughan asks the Court to expand the scope of the Rehabilitation Act's private right of action beyond the sorts of claims cognizable under the Americans with Disabilities Act ("ADA"), which it incorporates by cross-reference, in a manner no court has done before. Second, to the extent Maughan specifically challenges the Department's failure to consider his application outside the competitive process, there is nothing in the text of the statute or its attendant regulations affirmatively requiring the Department to do so. Third, to the extent that Maughan's claim involves the Department's broader systemic failure to hire more disabled applicants, standing concerns counsel against recognizing that claim.

While both parties agree that the court should evaluate Maughan's claim in this case under a version of the *McDonnell Douglas* burden-shifting framework, they disagree about the scope of the Rehabilitation Act's private right of action, and thus a key element of the prima facie case that Maughan bears the initial burden of making under that framework. The Department argues that Maughan must point to evidence of *discrimination* against him and that he has failed to adduce any evidence thereof. Maughan, relying on a novel interpretation of the Act without much citation or explanation, maintains that he need only point to evidence that the Department failed to meet an obligation under the Act's affirmative-action provisions to give him *preferential treatment* in

9

the hiring process. The Court agrees with the Department: While the Rehabilitation Act's private right of action encompasses discrimination, retaliation, and reasonable-accommodation claims like the ADA does, Maughan can point to no authority holding that a plaintiff may use it to challenge an agency's failure to adequately implement an affirmative-action plan and hire more disabled applicants.

In the Department's view, Maughan's claim falls squarely under the rubric of an ordinary disability-discrimination case. The Department argues, and Maughan does not squarely dispute,[2] that it has put forth a legitimate, nondiscriminatory reason for failing to interview or hire him: that he had little experience relevant to the Trial Attorney position. Furthermore, the Department argues, and Maughan once again does not dispute, that there is no evidence in the record from which a reasonable jury could determine that the Department refused to hire him *because of* his disability. *See* Defs.' Mem. in Supp. of S.J. at 8–13, ECF No. 20-1. Thus, according to the Department, Maughan fails to make out a *prima facie* case of disability discrimination at the first step of the *McDonnell Douglas* framework, and even if the analysis were to proceed to the second and third steps, no reasonable jury could return a verdict for him.

But in Maughan's view, that is all beside the point. He argues that his "claim is based on Defendant's failure [to satisfy] the legal obligation to affirmatively act in a manner that advances employment of PWTD." Pl.'s Opp'n to Defs.' Mot. for S.J. at 4, ECF No. 21. The Department cannot satisfy that obligation, he says, simply by treating him and other disabled applicants the *same* as everyone else—it must give them preferential treatment. And in order to make out his prima facie case under the *McDonnell Douglas* framework and refute the Department's

---

[2] Maughan does call it "suspect" for the Department to cite qualifications that "were not identified as [] required in the vacancy announcement" as its reason for failing to interview him, Pl.'s Opp'n at 7, but he does not argue that that justification is insufficient for the Department to meet its burden of proffering a nondiscriminatory reason under the *McDonnell Douglas* framework.

nondiscriminatory justification, he contends, he need not produce any evidence of discrimination—just evidence that the agency did not meet its affirmative-action obligations. *See id.* at 4–10.

However, none of the cases that Maughan cites for that proposition concerns an agency's obligation to "comply" with its own affirmative-action plan or to meet the numerical goals set out by regulation. Rather, those cases are in line with the Act's cross-references to the substantive standards for discrimination claims under the ADA for claims "alleging nonaffirmative action employment discrimination" by a federal agency. 29 U.S.C. § 791(f); *see Pueschel v. Chao*, 955 F.3d 163, 165 (D.C. Cir. 2020) (failure to rehire a disabled former employee in a position commensurate with her disability); *Taylor v. Rice*, 451 F.3d 898, 904 (D.C. Cir. 2006) (failure to make reasonable accommodations); *Perry v. U.S. Dep't of State*, 669 F. Supp. 2d 60, 63–64 (D.D.C. 2009) (discrimination and retaliation). The Court is aware of no authority extending the Rehabilitation Act's cause of action to claims challenging an agency's failure to take affirmative steps to hire more disabled applicants, either on an individual or systemic basis

The text of the Rehabilitation Act certainly provides little support for such a claim. The subsection creating the private right of action against federal agencies, 29 U.S.C. § 794a(a)(1), cross-references a remedial provision of Title VII that mentions "affirmative action" *remedies* such as the "reinstatement or hiring of employees" for unlawful discrimination or retaliation but does not otherwise impose affirmative-action *obligations* on employers, 42 U.S.C. §§ 2000e-5(g). Although § 794a(a)(1) itself later references "affirmative action remed[ies]," it provides that "[i]n fashioning" such a remedy, "a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor," 29 U.S.C. § 794a, suggesting that the only affirmative *obligation* Congress intended to make enforceable

through the private cause of action was one of reasonable accommodation. Meanwhile, the subsection incorporating the ADA's substantive standard by cross-reference, 29 U.S.C. § 791(f), contemplates only "*nonaffirmative action*" employment discrimination claims. *Cf. Kowalski v. Postmaster Gen. of the U.S.*, 811 Fed. App'x 733, 737 (3d Cir. 2020) ("By limiting claims to '*nonaffirmative action* employment discrimination,' the cause of action under [29 U.S.C. § 791] is not for all employment discrimination, but only for that related to nonaffirmative action, meaning 'the hiring, placement, and advancement of individuals with disabilities.'" (emphasis in in original)).

That lack of support in the statutory provisions creating the Rehabilitation Act's private cause of action is fatal to Maughan's claim. Absent "'rights-creating' language"—and particularly where, as here, the provision on which the plaintiff relies "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating"—the Supreme Court has instructed that courts should not presume Congress intended a statutory provision to be enforced by private litigants. *Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001). While § 791(b) does impose "affirmative action" duties on agencies, the farthest courts have gone in reading those duties into the private right of action is to suggest that they impose on agencies "heightened duties of '*reasonable accommodation*' not applicable to private employers under the ADA.'" *Woodman v. Runyon*, 132 F.3d 1330, 1339 n.8 (10th Cir. 1997) (emphasis added). This Court declines to extend the right of action further.

Furthermore, to the extent that Maughan takes issue with the Department's failure in his individual case to consider his application outside the ordinary competitive process, the regulation authorizing such a procedure, 5 C.F.R. § 213.3102(u), "is permissive; there is no obligation to hire a disabled applicant" non-competitively. *Ward-Johnson v. Glin*, No. 19-cv-534-CJN, 2020 WL

2770018, at *9 (D.D.C. May 28, 2020); *see also Hylton v. Calabria*, No. 17-cv-2023-RDM, 2020 WL 6134673, at *8 (D.D.C. Oct. 19, 2020); *MacDonald v. Cohen*, 233 F.3d 648, 653 (1st Cir. 2000). And there is certainly nothing in the text of the statute itself suggesting that an agency *must* make a non-competitive process available to disabled applicants in any given case.[3]

Finally, to the extent that Maughan takes issue more broadly with the Department's failure to meet the numerical goals for hiring disabled applicants set out in its own affirmative-action plan and by regulation, recognizing an individual cause of action to remedy such a systemic failure could raise constitutional concerns about Article III standing, the requirement that a plaintiff have a concrete injury in fact traceable to the conduct complained of and redressable by the remedy sought. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). It would be difficult to prove in any given case that the individual employment action was traceable to the broader shortcomings of the affirmative-action plan or that the individual injury would be redressable by improving that plan or enforcing it more aggressively. After all, neither the statute nor the regulation nor the Department's own plan requires that *every* applicant with a qualifying disability be given an affirmative preference in the hiring process, and it is entirely possible in this case that if the Department were to make a more robust effort, it would give such a preference to *other* disabled applicants besides Maughan.

Because Maughan can point to no evidence that the Department failed to hire him because of his disability, nor that the Department's proffered nondiscriminatory justification is pretextual, the Department is entitled to judgment as a matter of law. Therefore, the Court must grant summary judgment to the Department.

---

[3] The Court further notes that it is unclear from the record whether Maughan ever *requested* to apply for the position non-competitively.

### IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** defendants' motion for summary judgment and **ENTER JUDGMENT** for defendants. A separate Order consistent with this Memorandum Opinion shall issue this date.

Date: December ⎽⎽⎽, 2022

Royce C. Lamberth
United States District Judge